UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON


CIVIL ACTION NO. 2012-140 (WOB-CJS)


SHERRY EASTIN                                      PLAINTIFF


VS.                    MEMORANDUM OPINION AND ORDER


RELIANCE STANDARD LIFE
INS. CO.                                           DEFENDANT


This matter is before the Court on the parties' motions for judgment on the pleadings (Docs. 16, 17) and plaintiff's motion to strike (Doc. 21).

Having previously heard oral argument and taken these motions under submission, the Court now issues the following Memorandum Opinion and Order.

### Factual and Procedural Background

**A.   Plaintiff's Managerial Duties Involved "Light" To "Sedentary" Work**

In 1991, Plaintiff began working for the Castellini Company and became insured under its policy.  She was first diagnosed with fibromyalgia in 1998, and with "trigeminal neuralgia" in 2002.  She began missing a considerable number of work days in 2006 and 2007 due to "episodes" that

occurred once or twice a year.  By 2008, she was experiencing more than one episode a week.  When she stopped working in late February 2008 and submitted a disability claim, she was employed as the "MIS Manager" and had held that position for about ten years.  She was forty-six years old.  Her managerial position encompassed the company's computer and information system functions across multiple locations.  Plaintiff's duties included managing maintenance contracts, the programmers' projects and timelines, the network, security, and backup systems. *See, e.g.,* Doc. 16-1 at 1, 4; Doc. 25 at 4; AR 149, 156, 168, 427, 678, 696-98, 703.

The record indicates that, at its most difficult, Plaintiff's managerial position could involve "light" work. "Light" work involves lifting up to twenty pounds at a time, and a significant amount of walking or standing. Other sources in the record indicate that Plaintiff's position generally involved "sedentary" work.  "Sedentary" involves ten pounds at most and only occasional walking and standing.  *See* AR 197 (footnotes).

For example, when Plaintiff applied for disability benefits in 2008, she indicated the job had "no physical requirements, but a lot of mental requirements, memory, decision making, quick thinking, etc.," that she was unable

to perform.  *Id.* at 703; *see also id.* at 156.  The
employer's portion of the disability claim, however,
provided that the job involved "frequent" walking, which
would make the job "light."  *See id.* at 698.  When
Defendant denied her appeal in 2012, it applied Department
of Transportation-type definitions, and classified the
managerial position as a combination of "light" and
"sedentary."  *See id.* at 197.  DOT-analogous jobs
identified by a rehabilitation specialist indicated that
performing computer-related work can require effort in the
"light" range.  *See id.* at 679-83.

   **B.  The Terms Of The Policy**

      The policy pays benefits if four criteria are met.
The insured must: (1) be "totally disabled" by a "sickness
or injury" covered under the plan; (2) be "under the
regular care of a physician;" (3) be past the "elimination
period," and (4) submit "satisfactory proof" of the
disability.  *Id.* at 18.  "Sickness" means "illness or
disease."  *Id.* at 11.[1]

      "Total disability" is defined by what the insured can
or cannot do with respect to different jobs.  The policy
pays benefits for thirty-six months when the insured

---

[1] "Injury" means a "bodily injury resulting directly from an
accident," and is not at issue here.  *See* AR 10.

3

"cannot perform the material duties of his/her regular occupation." *Id.* Thereafter, the policy pays benefits when the insured "cannot perform the material duties of any occupation," meaning an occupation "that the insured's education, training or experience will reasonably allow." *Id.* To be capable of performing "any occupation" requires that the insured perform every material duty of the position on a "full-time basis." *Id.*

Benefits terminate on the earliest of four events: the date the insured dies, "ceases to be totally disabled," or "fails to furnish the required proof of total disability," or the date the "maximum duration of benefits" expires, which for Plaintiff will be when she reaches her mid-sixties. *Id.* at 19; *see also id.* at 9. Benefit payments are offset when the insured receives benefits from other sources, such as the Social Security disability award Plaintiff received. *See id.* at 18, 583.

Benefits are limited when "mental or nervous disorders" are present, including "depressive disorders" or "somatoform disorders," the latter meaning "psychosomatic illness." *Id.* at 22. When a "total disability" is "caused by or contributed to by mental or nervous disorders," the policy will not pay benefits "beyond an aggregate lifetime maximum duration of twenty-four . . . months," unless the

4

insured is "in a hospital or institution at the end of the twenty-four . . . month period."  *Id.*

## C.  Assessing & Diagnosing Fibromyalgia

When Plaintiff quit working in 2008, she complained that her "constant fatigue, widespread pain, [inability] to think clearly" was due to fibromyalgia, her "mouth/teeth pain" was due to "trigeminal neuralgia," and these symptoms rendered her unable to work.  *Id.* at 700, 703.  Plaintiff's treating physician at the time, John B. Kelly, provided the "attending physician" portion of the 2008 claim form.  *See id.* at 704-05.  He indicated Plaintiff's primary diagnoses were fibromyalgia and trigeminal neuralgia.  *Id.* at 704. He listed "depression" as a "secondary condition[] contributing to [her] disability."  *Id.*

As defined by the National Institute of Arthritis and Musculoskeletal and Skin Diseases (NAIMS):[2]

> Fibromyalgia syndrome is a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. . . .
>
> Although fibromyalgia is often considered an arthritis-related condition, it is not truly a form of arthritis . . . because it does not cause inflammation or damage to the joints, muscles, or other tissues. Like

---

[2] The "NIAMS is one component of the National Institutes of Health (NIH), which is an agency within the U.S. Department of Health and Human Services (HHS) [and] NIAMS researches diseases of the bones, joints, muscles, and skin." www.niams.nih.gov/About_Us/Contact_Us/faq.asp

arthritis, however, fibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities.  Also like arthritis, fibromyalgia is considered a rheumatic condition, a medical condition that impairs the joints and/or soft tissues and causes chronic pain.

* * * * *

In addition to pain and fatigue, people who have fibromyalgia may experience a variety of other symptoms including:

cognitive and memory problems (sometimes referred to as "fibro fog")

* * * * *

The causes of fibromyalgia are unknown, but there are probably a number of factors involved.

* * * * *

Research shows that people with fibromyalgia typically see many doctors before receiving the diagnosis.  One reason for this may be that pain and fatigue, the main symptoms of fibromyalgia, overlap with those of many other conditions.  Therefore, doctors often have to rule out other potential causes of these symptoms before making a diagnosis of fibromyalgia.  Another reason is that there are currently no diagnostic laboratory tests for fibromyalgia; standard laboratory tests fail to reveal a physiologic reason for pain.  Because there is no generally accepted, objective test for fibromyalgia, some doctors unfortunately may conclude a patient's pain is not real, or they may tell the patient there is little they can do.

A doctor familiar with fibromyalgia, however, can make a diagnosis based on criteria established by the American College of Rheumatology (ACR): a history of widespread pain lasting more than 3 months, and other general physical symptoms including fatigue, waking unrefreshed, and cognitive (memory or thought) problems.

> Pain is considered widespread when it
> affects all four quadrants of the body,
> meaning it must be felt on both the left and
> right sides of the body as well as above and
> below the waist. ACR also has designated 18
> sites on the body as possible tender points.
>
> [Diagram of "The location of the nine paired
> tender points that make up the American
> College of Rheumatology criteria for
> fibromyalgia."]
>                    * * * * *
> Fibromyalgia is a chronic condition, meaning
> it lasts a long time—possibly a lifetime.
> However, it may be comforting to know that
> fibromyalgia is not a progressive disease.
> It is never fatal, and it will not cause
> damage to the joints, muscles, or internal
> organs. In many people, the condition does
> improve over time.

www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp.

The fact that the symptoms of fibromyalgia "'are entirely subjective'" is "'of greatest importance to disability law.'" *Cooper v. Astrue,* No. 1:10CV-00012-J, 2010 WL 5557448, at *3 (W.D. Ky. Oct. 15, 2010) (citation omitted), Report and Recommendation adopted, 2011 WL 53195 (W.D. Ky. Jan. 7, 2011). As NAIMS and other sources note, a diagnosis is not to be based exclusively on the patient's subjective complaints. Rather, it is "'based upon observation of the characteristic tenderness in certain

focal points, recognition of hallmark symptoms, and systematic elimination of other diagnoses.'"   *Id.* (same).[3]

A physician's objective assessment also typically includes exerting pressure on certain "control points" that are not among the eighteen tender points, to compare the patient's reaction and evaluate what factors may be causing the pain.[4]  In addition, though the NAIMS definition does not identify depression as a comorbid condition with fibromyalgia, other sources and articles have long found depression to be a symptom of the disease, and some cases specifically discuss where physicians diagnose depression associated with fibromyalgia.[5]

---

[3] *See also, e.g. Huffaker v. Metro. Life Ins. Co.,* 271 F. App'x 493, 500, n.2 (6th Cir. 2008) ("'There are no laboratory tests for the presence or severity of fibromyalgia.  The . . . only symptom that discriminates between it and other diseases of a rheumatic character [is] multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.'") (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 916 (7th Cir. 2003)).

[4] *See, e.g., Huffaker v. Metro. Life Ins. Co.,* 271 F. App'x 493, 496 (6th Cir. 2008); *Larson v. Astrue,* 780 F. Supp. 2d 935, 945 (W.D. Mo. 2011); *Maynard v. Astrue,* No. 3:06cv0988, 2008 WL 925282, at *5 (M.D. Tenn. Apr. 3, 2008).

[5] *See, e.g., Lang v. Long-Term Disability Plan Of Sponsor Applied Remote Tech,, Inc.,* 125 F.3d 794, 796 (9th Cir. 1997); *Zenadoccio v. BAE Sys. Unfunded Welfare Benefit Plan,* ___ F. Supp. 2d ___, ___, No. 3:12-cv-99, 2013 WL 1327122, at *16 (S.D. Ohio Mar. 29, 2013); *Lewis v. Hartford Life & Accident Ins. Co.,* Civil Action No. 3:10CV-710-S, 2011 WL 6292203, at *3 (W.D. Ky. Dec. 15,

In diagnosing Plaintiff with fibromyalgia, Dr. Kelly employed these recognized techniques.  He noted on his section of the claim form that Plaintiff complained of "generalized muscle aches and facial pain," and his "objective findings" included "diffuse muscle tenderness and stiffness, trigger points." *Id.* at 704.  All of his underlying medical records, however, which Defendant reviewed throughout the time it paid benefits, note that Plaintiff consistently reacted positively on sixteen of eighteen of the tender points, and zero out of four of the control points.[6]  Also, Dr. Kelly documented that

---

2011); *Thorton v. Barnhart,* No. Civ.A. 505CV00055, 2006 WL 759672, at *12, n.12 (W.D. Va. Mar. 21, 2006).

[6] *See* AR 151 (Defendant 9/10/08 note of review of medical records – "16/18 fibromyalgia syndrome tender points and 0/4 control points."); *id.* at 359 (Dr. Kelly assessment 06/30/11 – "16/18 FMS tender points and 04/controls, highly consistent with FMS. Marked tenderness over bilateral trochanteric bursa [part of the hip]"); *id.* at 362 (identical 3/30/11); *id.* at 365 (identical 12/8/10); *id.* at 368 (Dr. Kelly assessment 8/19/10 – "16/18 FMS tender points and 0/4 controls, highly consistent with FMS."); *id.* at 371 (identical 5/9/10); *id.* at 374 (Dr. Kelly 1/5/10 assessment – "16/18 FMS tender points and 0/4 controls, highly consistent with FMS.  Marked tenderness over the right lateral eponcondyle [elbow] and right upper trap [shoulder]"); *id.* at 377 (Dr. Kelly assessment 10/16/09 – "16/18 FMS tender points and 0/4 controls, highly consistent with FMS."); *id.* at 380 (identical 9/11/09); *id.* at 383 (identical 7/22/09); *id.* at 386 (identical 4/22/09); *id.* at 389 (identical 1/22/09); *id.* at 392 (identical 10/23/08); *id.* at 394 (identical 7/23/08); *id.* at 397 (identical 4/30/08); *id.* at 400 (identical 3/19/08); *id.* at 403 (identical 1/31/08); *id.* at 406 (identical 10/26/07); *id.* at 409 (identical 9/10/07); *id.* at 412 (identical 08/09/07); *id.* at 415 (identical 5/17/07); *id.* at 419 (identical 1/18/07); *id.* at 425 (identical 10/31/06).

Plaintiff's fibromyalgia was accompanied with the "comorbid" conditions of, among other things, fatigue, depression, anxiety, severe cognitive issues.  Defendant's notes reflect the same association.  *See id.* at 179, 181, 192.

Conversely, Plaintiff's trigeminal neuralgia is not a symptom of fibromyalgia.  As defined by the National Institute of Neurological Disorders and Stroke (NINDS)[7] on its website, trigeminal neuralgia:

> is a chronic pain condition that causes extreme, sporadic, sudden burning or shock-like face pain. The pain seldom lasts more than a few seconds or a minute or two per episode.  The intensity of pain can be physically and mentally incapacitating.  TN pain is typically felt on one side of the jaw or cheek. Episodes can last for days, weeks, or months at a time and then disappear for months or years. . . .  Although sometimes debilitating, the disorder is not life-threatening.

www.ninds.nih.gov/disorders/trigeminal_neuralgia/trigeminal_neuralgia.htm.

**D. Chronology of Payment & Termination Of Benefits**

Defendant's internal notes show that it was aware of Plaintiff's diagnosis of fibromyalgia and depression/anxiety from the outset when it began paying benefits, with the fibromyalgia onset as of February 2008,

---

[7] NINDS is part of the National Institutes of Health (NIH)." www.ninds.nih.gov/about_ninds/index.htm.

and the depression onset as of August 2008.  Some notes consider fibromyalgia the "primary diagnosis" and others consider "depressive disorder" as the primary diagnosis. Others list fibromyalgia and trigeminal neuralgia as the diagnoses, but that depression was a "comorbid" condition. *See, e.g.,* AR 151-52, 168-69, 172, 179, 181, 191-93.

Dr. Kelly considered Plaintiff "disabled" because of: "extreme limitations" in her mental abilities to perform tasks; a complete inability to drive; ability to sit, stand or walk for no more than three hours in an eight-hour workday; only occasionally being able to lift or carry ten-pound and small objects, bend at the waist or reach overhead; and no ability to ever squat, kneel, or crawl. *Id.* at 705.

The limitations Dr. Kelly indicated effectively precluded Plaintiff from performing her prior managerial position, regardless of how it was classified, or from performing any other strictly sedentary job.  Defendant initially interpreted Plaintiff's limitations that way, observing in notes following a review of medical records that Plaintiff could do "less than sedentary" work" and/or "no sustained work function." *See, e.g., id.* at 151, 153, 154, 172, 191, 193, 195.  It began paying benefits as of August 2008.  *See id.* at 191-92.

11

In early December 2010, after Plaintiff had been receiving benefits for some two years and was then forty-eight years old, Defendant's notes reflect that according to Dr. Kelly's records, Plaintiff "has taken a turn for the worse with regard to depression," due to "major stressors this year" and was "willing to try antidepressants again." *Id.* at 153. As of December 22, 2010, a registered nurse was conducting a "'RUSH (Ongoing)" review. *Id.* at 181. She posed the question: "What are [Plaintiff's] R&L's [restrictions and limitations] based on upon the documentation provided?" *Id.*

As of April 2011, Plaintiff's claim was "reassigned" for "the AO review," *id.* at 182, because the 36-month mark for Plaintiff's receipt of benefits was due to expire on August 18, 2011. Under the terms of the policy, after that date, Plaintiff would only continue to receive benefits if she could not perform "any" work. *See, e.g., id.* at 431.

By July 19, 2011, notes by a nurse reviewer concluded that, despite Dr. Kelly's continued notes that Plaintiff has "severe . . . memory problems," it "appear[ed]" to the reviewer that Plaintiff's "depression and anxiety" were worsening her chronic symptoms of "pain, memory loss and fatigue." *Id.* at 155. The nurse found "nothing in the file to suggest an organic basis for [Plaintiff's] memory

12

problems." *Id.; see also id.* at 196.  She believed that,
whereas Plaintiff's prior position was "light," *id.* at 185,
from "a physical standpoint only, without the psychiatric
contribution of depression and anxiety . . . [Plaintiff]
would be capable of sedentary work," *id.* at 155; *see also
id.* at 196.

### E.  Reasons Stated For Terminating Benefits

On July 25, 2011, Defendant informed Plaintiff that it
would no longer pay benefits after August 18, 2011 because
she could perform sedentary work.  The rationale reflected
the nurse's observations:  "nothing in your record suggests
an organic basis for memory problems;" "the symptoms of
chronic pain, memory loss, and fatigue are worsened by
depression and anxiety;" and "you appear capable of
sedentary work [and] can perform, and would qualify for . .
. Computer Operations Manager, User Support Analyst and
Computer Processing Scheduler."  *Id.* at 431.

The letter mentioned that it found the prior Social
Security Administration award unpersuasive because that
agency employs different guidelines and did not review the
same medical evidence as Defendant had over the past
several years.  *See id.* at 432.

The letter also mentioned the "mental disorder" 24-
month cap based on Plaintiff's diagnosed depression and

anxiety. *See id.* at 431-32.  The subsequent appeal
decision explained:

> While cognitive and memory issues were noted
> to be ongoing, these complaints were
> assessed to be of a psychiatric etiology,
> rather than organic in nature.  As such,
> impairment for these issues would be subject
> to the Policy's above-referenced twenty-four
> month limitation for "Mental and Nervous"
> diagnoses.  Ms. Eastin had already bee paid
> for thirty-six months of benefits at that
> point.  Consequently no additional benefits
> were payable for Ms. Eastin's ongoing
> psychiatric conditions.

*Id.* at 200.

### F.   Contradictory Physician Opinions On Plaintiff's Limitations Following Independent Examinations

Plaintiff instituted an appeal in October 2011 through
her former attorney John Fortner.  *See, e.g., id.* at 197,
349.  Dr. Kelly had written Mr. Fortner and advised that
Plaintiff was still severely limited and could not work due
to her fibromyalgia and its associated mental conditions.
Dr. Kelly reiterated that Plaintiff was now "tender at
18/18 . . . and 0/4 controls," and with "marked tenderness
over her bilateral trochanteric bursa," which "meets and
exceeds the American College of Rheumatology diagnostic
criteria for fibromyalgia syndrome," *id.* at 353, and
suffers from comorbid conditions including depression, *id.*
at 354.  He considered Plaintiff "permanently and totally

14

disabled from any type of employment including sedentary labor." *Id.* at 354.

Based on counsel's arguments, a member of Defendant's "in-house medical staff . . . recommended two separate independent medical examinations for Ms. Eastin." *Id.* at 201, 349-52.  Defendant arranged for these exams, and at its own expense. *See id.* at 337.

Dr. Nicholas Doninger conducted the neurophysical evaluation in mid-January 2012, *see id.* at 206-19, and concluded that Plaintiff had "cognitive deficiencies" that "undermine [her] ability to work full-time," *id.* at 202, 215.  However, he also concluded those impairments "'appear to have a psychiatric etiology,'" *id.* at 202, 214.  The appeal decision relied on that assessment to determine that the 24-month mental disorder cap precluded any further payment, as Plaintiff plainly had never been institutionalized. *See id.*

Dr. Doninger's report does state that "[t]here is no indication ***in available records*** of symptom magnification or drug-seeking behavior [by Plaintiff] for her pain symptoms but rather a tendency to under medicate." *Id.* at 208 (emphasis added); *see also id.* at 206.  Nonetheless, while he reviewed the records of Plaintiff's physicians, he did

15

so months before the independent *physical* examination
Defendant arranged.

Dr. Steven Wunder conducted that physical evaluation
in mid-March 2012. *See id.* at 226-39. According to his
curriculum vitae, Dr. Wunder has made presentations to the
Cincinnati Bar Association on the topics of "depositions"
and "Fibromyalgia Syndrome, Myofascial Pain and Chronic
Fatigue," *id.* at 247, several presentations to the American
Academy of Disability Evaluation Physicians, *id.* at 248-49,
and to the "SAE-P"[8] on the topic of "Fatigue:  A New
Frontier," *id.* at 249.

Among the materials submitted with his report is one
page from the "Guides To The Evaluation Of Permanent
Impairment." *Id.* at 236. This source reviewed research
and states that "pain need not be symptomatic of a disease
or injury but, in fact, can become a disease unto itself."
*Id.* The page is highlighted where it states that one
strategy physicians use to "attempt to link the complaints
of pain patients to a biological abnormality" is to
"construct diagnoses based on the person's symptom's and on
subjective physical examination findings," such as "the

_____

[8] This is likely the "Self-Assessment Exams For Practitioners
(SAE-P)," a species of continuing education requirements for
certification by the "American Board Of Physical Medicine
Rehabilitation," which is one of the board certifications Dr.
Wunder holds. *See* AR 241; *see also* http://me.e-
aapmr.org/SAEP.aspx.

diagnosis of fibromyalgia," for which, "[d]espite extensive research, no specific underlying biological abnormality has been discovered to explain the reports of these people." *Id.* After reviewing Dr. Kelly's records and examining Plaintiff, Dr. Wunder plainly believed that Dr. Kelly fell into this diagnostic camp.

For example, although Dr. Wunder also found Plaintiff to be "tender in 18 of 18 areas for fibromyalgia," unlike Dr. Kelly, he also found Plaintiff to also be "tender in sham areas," with "positive signs of magnification with simulation studies with axial compression and rotation." *Id.* at 229; *see also id.* at 202-03, 230-31. Dr. Wunder also conducted "Waddell" testing. "Waddell's signs" are tests used by physicians to reveal whether pain has a "non-organic or psychological component." http://en.wikipedia.org/wiki/Waddell's_signs. "One or two Waddell's signs can often be found even when there is not a strong non-organic component to pain. Three or more are positively correlated with high scores for depression, hysteria and hypochondriasis on the Minnesota Multiphasic Personality Inventory." *Id.*

Each of Dr. Kelly's medical notes cited in footnote six state "[n]o symptom magnification" in the "general

appearance" section, but these notes do not mention any
Waddell's testing.  Dr. Wunder stated of Plaintiff:

> She had positive Waddell signs for
> magnification with range of motion and
> distracted straight leg raise.  She
> restricted her lumbar mobility to 30 degrees
> of lumbar flexion angle, 20 degrees of
> extension and 20 degrees of lateral bending.
> Straight leg raise was to 90 degrees without
> complaints of back of leg pain.

*Id.* at 229.

Dr. Wunder was of the opinion that Dr. Kelly's records
contained "little in the way of objective findings" and the
fact that his [t]reatment had been ineffective . . . would
suggest more of a cognitive behavioral problem."  *Id.* at
231.  He concluded Plaintiff had no physical work
limitations whatsoever:

> . . . Fibromyalgia is a condition probably
> linked to some degree of somatization. There
> were no objective clinical abnormalities.
>
> Based upon examination, there was no medical
> data to substantiate the presence of a
> physiologic abnormality.  Medical science
> has not identified any specific underlying
> biological abnormality to explain the
> reports of pain in such patients.
>
> The subjective complaints are not supported
> by objective findings. There is some degree
> of magnification.
>                       * * * * *
> The prognosis in this case is guarded given
> the duration of it.
>
> Based upon the above rationale, there would
> be no objective reason to have any

18

limitations or restrictions. There has been
no adverse tissue or biologic abnormality
that has occurred by people working with
fibromyalgia.

The patient does have the capacity to work
on a full time, consistent basis from a
musculoskeletal standpoint since there is no
known biologic abnormality with this
condition. There would be no reason for any
restrictions or limitations on her
activities. Any restrictions or limitations
would be more due to her tolerance and not
due to any objective tissue abnormality.

There is no evidence of any restrictions on
her functional capacities. She is able to
sit/stand/walk without any limitations or
restrictions throughout an eight hour day.
There would be no limitations or
restrictions on reaching, handling,
fingering, feeling, motor coordination,
finder dexterity or manual dexterity. There
would be no need to restrict lifting,
carrying, pushing or pulling.

The patient denied any side effects from
usage of her medication. She felt that it
did help her.

*Id.* at 231-32.

Defendant relied on Dr. Wunder's assessment and

conclusion in deciding that Plaintiff at least could

perform sedentary work. *See id.* at 203-05. It reiterated

that the Social Security Administration award was

"considered" but not binding or persuasive because of the

"different set of guidelines" and "different medical

evidence" before that agency, specifically the absence of

19

Defendant's post-award medical evidence, Dr. Doninger's
report, and/or Dr. Wunder's report.  *Id.* at 204-05.

### *Analysis*

This Court's review is governed by the deferential
arbitrary and capricious test,[9] and Defendant's status as a
final decision maker and self-insurer presents a structural
conflict of interest that must be considered as a factor in
making that determination.  *See, e.g., Judge v. Metro. Life
Ins. Co.,* 710 F.3d 651, 657-58 (6th Cir. 2013); *McLaren-
Knopfer v. ArvinMeritor, Inc.,* 876 F. Supp. 2d 913, 920-23
(E.D. Ky. 2012); *Huffaker,* 271 F. App'x at 498; Doc. 16-1
at 2-3; Doc. 17-1 at 6-9; Doc. 18 at 3-4.  "Under this
deferential standard, [the Court] will uphold a benefit
determination if it is rational in light of the plan's
provisions. . . .  Thus, [the Court] will uphold a decision
if it is the result of a deliberate principled reasoning
process, and if it is supported by substantial evidence."
*Huffaker,* 271 F. App'x at 498 (internal quotations and
citations omitted).

---

[9] The Sixth Circuit requires a "clear" or "express" grant of
discretion to the policy administrator before the arbitrary and
capricious standard will be used.  As Defendant points out, the
policy's "insuring clause" requires the insured to submit
"satisfactory proof of total disability," and the Sixth Circuit
has interpreted that language to qualify.  *See* Doc. 17-1 at 8
(citing *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376,
381 (10th Cir. 1996)).

### A. Double Recovery for Depression

Plaintiff's claim for continued long-term benefits is based on her diagnosis of fibromyalgia. Her motion for judgment injects a claim for mental health benefits for depression. As Plaintiff interprets the policy, if she has a mental health disability in addition to fibromyalgia, then she is entitled to additional benefits for a period of two years. *See* Doc. 16-1 at 14. This claim has no merit.

Plaintiff asserts that "Defendant did . . . not have any reports regarding disability of mental issues until" Dr. Doninger conducted and submitted his neuropsychological evaluation in January 2012. Doc. 16-1 at 14. The record, however, belies that contention. Depression was present as a diagnosis before Plaintiff was referred to Dr. Kelly in 2006, *see* AR 423, and, as discussed above, was part of Defendant's disability equation from the outset of her claim.

Plaintiff further contends that "[i]f Defendant wanted to limit disability payments for overlapping disabilities from mental and physical functional loss it certainly could have provided [the] same in its plan, but in the absence of such limitation, Plaintiff ought to be paid for mental illness disability." Doc. 16-1 at 14. The plain language of the policy, set forth above, does just that.

21

The mental health provision appears in the section of the policy entitled "LIMITATIONS."  By its terms, the two-year cap applies where a mental condition "causes" or "contributes to" the "total disability."  From the outset, Dr. Kelly considered depression to be a comorbid condition, meaning fibromyalgia and depression present together, simultaneously.  Plaintiff's stated position on her claim form was that the "fibro fog" and fatigue affected her capacity to perform the mental aspects her job.  These symptoms are not different in kind or degree from the effects people suffer when they are depressed.  According to the National Institute of Mental Health, "[s]igns and symptoms [of depression] include:  Fatigue and decreased energy; Difficulty concentrating, remembering details, and making decisions."[10]

Because the two conditions of fibromyalgia and depression were present simultaneously, Plaintiff received more in benefits than she would have been entitled to under the plain terms of the policy.  Defendant acknowledges this windfall, and is not seeking reimbursement the benefits it overpaid.  *See* Doc. 17-1 at 6 ("Reliance Standard never sought reimbursement of the additional year of benefits

---

[10] www.nimh.nih.gov/health/publications/depression/index.shtml.

that were paid to Plaintiff during the last year of the 36-
month own occupation period."). Having made the concession
in this action that it forwent reimbursement, Defendant has
waived any future right to reimbursement for overpayment.[11]

### B. *Decision Was Not Arbitrary or Capricious*

Plaintiff cites some of the many decisions that
discuss fibromyalgia is recognized a potentially disabling
disease and is unique for the reasons outlined above. Some
of these cases do conclude that relying on a lack of
objective medical evidence is erroneous and/or arbitrary
seemingly because, by definition, fibromyalgia consists of
subjective complaints and is not susceptible to
verification by objective scientific tests. *See* Doc. 16-1
at 5-13. Plaintiff considers these cases dispositive in
her favor. Her logic is as follow: her "chief" medical
condition is fibromyalgia; Dr. Kelly diagnosed that
condition by his tender points test results; Dr. Wunder
also found the same tenderness in all of those spots
tender; and because this test confirms she has
fibromyalgia, she cannot be required to prove the condition
by objective medical testing; therefore, to deny her
benefits is unreasonable. *Id.* at 13. The Court rejects

---

[11] *See, e.g., United States v. Turrietta,* 696 F.3d 972, 987 (10th
Cir. 2012) ("Waiver results when a party, after deliberation,
chooses a particular litigation position to press while foregoing
others.").

this reasoning for several reasons.

First, Plaintiff takes the position that Defendant cannot rely on a lack of objective evidence to deny benefits, and she thus characterizes Defendant's denial as having been based on her "fail[ure] to furnish the required proof of total disability." AR 19. In context however, the stated reasons in the decision are clearly based on the justification that she "cease[d] to be totally disabled," *id.,* based on Dr. Wunder's independent examination. The decision expressly concluded that "the medical record indicated the [Plaintiff] was capable of Sedentary work function," AR 199, and explained:

> Dr. Wunder stated quite conclusively that he believed that there were ***no measurable limitations or restrictions to preclude work on a full-time consistent basis*** from a musculoskeletal standpoint . . . . Consequently, the Sedentary occupations previously identified . . . remain viable occupational alternatives . . . Therefore, . . . she no longer fulfills the Policy's definition of 'Total Disability' beyond thirty-six months of benefits, and our appeal review must conclude that the original decision to deny benefits was appropriate.

*Id.* at 204 (emphasis added). The cessation of "total disability" is one of the four policy-defined events upon which benefits cease.

In addition, the Court agrees with Defendant that Plaintiff is conflating diagnosis with disability, whereas the two are "separate and distinct."  Doc. 18 at 6.  "Here, the terms of the [policy will] grant benefits [beyond 36 months] when an employee is unable to perform [any work].  Thus, a diagnosis is not determinative, and Plaintiff's functional capacity is key."  *McLaren-Knipfer,* 876 F. Supp. 2d at 921; *see also, Zenadoccio v. BAE Sys. Unfunded Welfare Benefit Plan,* ___ F. Supp. 2d ___, ___, No. 3:12-cv-99, 2013 WL 1327122, at *15 (S.D. Ohio Mar. 29, 2013) ("Hartford does not dispute that Zenadocchio suffers from fibromyalgia; however, this diagnosis is not dispositive of Zenadocchio's eligibility.  Zenadocchio must be 'disabled' under the Plan from performing [work]."); Doc. 18 at 6-7 (cases cited therein).

In the ERISA context, the Sixth Circuit has specifically stated that while an insured "could certainly find [it] burdensome [to] proffer objective evidence of fibromyalgia itself" the insured can furnish "objective evidence of a disability due to fibromyalgia . . . without the same level of difficulty" by proffering evidence of a "functional capacity evaluation, [which is] a reliable and objective method of gauging the extent one can complete work-related tasks."  *Huffaker,* 271 F. App'x at 500

25

(internal quotations and citation omitted) (emphasis added).

Moreover, Defendant's reliance on "the opinions of physicians other than the treating physician," concerning "functional limitations . . . cannot be said to have been arbitrary and capricious." *Id.* at 502-03.  Recent decisions have so indicated or held in ERISA actions involving a fibromyalgia diagnosis, even when a structural conflict of interest exists.  *See, e.g.; Hunt v. Metro. Life Ins. Co.,* No. 12-cv-11231, 2013 WL 1800413, at *8-9 (E.D. Mich. Apr. 23, 2013).

Finally, the appeal decision considered the earlier Social Security award, and identifies legitimate reasons why it reached a different decision than that agency.[12]  As such, the different results are not indicative of arbitrariness.  *Cf. Geiger v. Pfizer, Inc.,* 918 F. Supp. 2d. 697, 705-07 (S.D. Ohio 2013).

---

[12] In August 2008 the Social Security Administration awarded Plaintiff disability benefits finding the onset month to be of February 2008. The record does not indicate that the matter went to the ALJ level, so there is no reasoned decision from the administration in the present record.  The only record of the Social Security award is a summary of payment calculations.  *See* Doc. 16-1 at 1; AR 577-82.  Other sources that refer to the award do not mention the reasons for it.  *See, e.g.,* AR 204-05,583-85.

Therefore, having reviewed this matter, and the Court being otherwise advised,

**IT IS ORDERED** that plaintiff's motion for judgment (Doc. 16) be, and is hereby, **DENIED;** defendant's motion for judgment (Doc. 17) be, and is hereby, **GRANTED**; and plaintiff's motion to strike be, and is hereby, **DENIED**.


This 23rd day of August, 2013.




Signed By:
_William O. Bertelsman_  W0B

United States District Judge